ter, 2 Jones & S. 499. The distinction in the rule as to proof of non-payment in equitable actions to enforce a lien and in ordinary actions for recovery of money is shown by the fact that in an action for the foreclosure of a mortgage given as collateral to a bond nonpayment upon the bond must be proved, while in an action on the bond alone this is unnecessary. Coulter v. Bower, 11 Daly, 203; Davis v. N. Y. Concert Co., 41 Hun, 492. In the present case the plaintiff seeks to enforce a collateral which the testator provided for the payment of her claim. The right to resort to the collateral depends upon whether there remains anything due her on her legacy. She is not suing the devisee because he became liable to pay her legacy by accepting the devise, nor is she seeking to enforce payment from his representative, for his representative, as such, is not a party to the action. Although the plaintiff now asserts that she was not obliged to prove nonpayment, yet on the trial she evidently recognized that this burden was upon her, for she sought to prove the fact by declarations of the devisee to the effect that the legacies had not been paid. While such declarations would have been competent against the devisee himself, and would be competent against his representatives were they made parties to the action, they were mere hearsay as against the devisee's mortgagee, this appellant, and were improperly received as against her. The declarations of an assignor of a mortgage, made while he was the owner, are inadmissible against his assignee to defeat his title or establish equities in favor of the mortgagor. Merkle v. Beidleman, 165 N. Y. 21, 58 N. E. 757. Such declarations must be equally inadmissible to establish the existence of a lien prior to that of his mortgagee, or to enlarge its amount. If the plaintiff has a lien existing and prior to that of the mortgage of the appellant, she must establish it by common-law evidence aside from such declarations. The nonpayment of the legacy being a fact incumbent upon the plaintiff to prove, evidence upon that subject was material, and appellant's objection to such declarations as against herself was well taken. Mere proof of demand of payment was no proof of actual nonpayment. There being no other evidence of nonpayment in the case other than these inadmissible declarations, it follows that the judgment must be reversed, and a new trial granted, with costs to the appellant to abide the event. The judgment being reversed, the order appealed from becomes inoperative, and the appeal therein should be dismissed, without costs.

Judgment reversed, and new trial granted, with costs to appellant to abide event. All concur, except SMITH, J., dissenting, and CHESTER, J., not voting.

(90 App. Div. 408.)

## PEOPLE v. HEINZ et al.

(Supreme Court, Appellate Division, Fourth Department. January 12, 1904.)

1. FOODS—CIDER VINEGAR—"PURE"—STATUTE—CONSTRUCTION.
   Under Agricultural Law (Laws 1893, p. 667, c. 338) § 50, defining the term "cider vinegar" as used in that law as vinegar made exclusively from "pure" apple juice, the word "pure" means "free from mixture or contact with that which is deleterious, impairs, vitiates, or pollutes."

2. SAME.

Under Agricultural Law (Laws 1893, p. 667, c. 338) §§ 50–52, to prevent injury to health by penalizing the manufacture of vinegar which is not made from pure apple juice, the object of the statute is not defeated by the treatment of the apple juice, in the course of manufacture, by the introduction of pure water, to reduce the acid to vinegar.

Appeal from Trial Term, Erie County.

Action by the people of the state of New York against Henry J. Heinz and others. From a judgment for defendants, plaintiff appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

John Cunneen, Atty. Gen., and W. F. Mackey, for the People.
Rogers, Locke & Milburn, for respondents.

STOVER, J.   This action is brought to recover penalties for violations of sections 50, 51, and 52 of the agricultural law (Laws 1893, p. 667, c. 338), which are as follows:

"Sec. 50. Definition of Adulterated Vinegar.—All vinegar which contains any proportion of lead, copper, sulphuric acid, or other ingredients injurious to health, or any artificial coloring matter, or which has not an acidity equivalent to the presence of at least four and one-half per centum, by weight, of absolute acetic acid, or cider vinegar which has less than that amount of acidity, or less than two per centum of cider vinegar solids on full evaporation over boiling water, shall be deemed adulterated. The term cider vinegar when used in this article, means vinegar made exclusively from pure apple juice. Provided, however, that cider vinegar made by a farmer in this state exclusively from apples grown on his land, or their equivalent in cider taken in exchange therefor, shall not be deemed adulterated, if it contain two per centum solids and sufficient alcohol to develop the required amount of acetic acid.

"Sec. 51. Manufacture and Sale of Adulterated or Imitation Vinegar Prohibited.—No person shall manufacture for sale, keep for sale or offer for sale: (1) Any adulterated vinegar. (2) Any vinegar or product in imitation or semblance of cider vinegar, which is not cider vinegar. (3) As or for cider vinegar, any vinegar or product which is not cider vinegar.

"Sec. 52. Packages Containing Cider Vinegar to be Branded.—Every manufacturer or producer of cider vinegar shall plainly brand on the head of each cask, barrel, keg or other package containing such vinegar, his name and place of business and the words 'Cider Vinegar.' And no person shall mark or brand as or for cider vinegar any package containing that which is not cider vinegar."

The complaint, by several allegations, charges that the defendants engaged in selling, keeping for sale, and offering for sale "a substance made in imitation and semblance of cider vinegar, manufactured exclusively from pure apple juice, and which was and is not pure cider vinegar, but a compound manufactured in imitation and semblance thereof," falsely branding it as cider vinegar, and that it is not pure cider vinegar, and with having falsely printed upon or affixed labels to the barrels and casks containing said adultered compound calculated to deceive the purchasers of the spurious vinegar. Plaintiff also alleged the manufacture by defendants of an adulterated compound made in imitation or semblance of cider vinegar, but which was not cider vinegar made exclusively from pure apple juice.

Samples were taken from barrels by inspectors from the Agricultural Department, and no question is made as to the fairness of

the samples. Analyses of the samples were made, both by chemists for the state and chemists for the defendants, and it is conceded that the samples were identical. According to the analysis of the defendants, the samples contained the requisite per centum of cider vinegar solids, and the evidence shows that the acetic acid may vary in cider vinegar from 3 to 6 or 7 per cent., and that the solids remaining in the vinegar have no special virtue or value, but are there simply because they have not been eliminated in the process of extracting the juice or in the process of manufacture.

The testimony of the defendants' manager as to the making of the vinegar showed that the apples were squeezed, the juice put in tanks, where it was allowed to remain for some time, then put in clearing tanks or vats, and from there into generators. In those generators alcohol, as the result of the fermentation, was turned into acetic acid. The acetic acid was then put in tanks, and allowed to remain for a long time, and then reduced to the acidity which the law permits, and barreled for use. This reduction of the acidity is accomplished by the use of pure water, no other ingredient being added. It also appears that when taken from the tanks for the purpose of reducing to vinegar the amount of acetic acid that is developed is very high; that it is neither palatable nor marketable vinegar, but is still acid, as distinguished from vinegar, and is not desirable or marketable for general use, and such uses as vinegar is generally put to.

We may perhaps dispose of the contention as to the defendants' adulteration of the vinegar as shown by analyses by confirming the holding of the trial judge that the product of the defendants was unadulterated, and contained no proportion of lead, copper, sulphuric acid, or other ingredients injurious to health, or any artificial coloring matter, and had an acidity equivalent to at least 4½ per centum by weight of absolute acetic acid, or not less than 2 per centum of cider vinegar solids on full evaporation over boiling water, and that it complied in every particular with the standards and requirements of the statute in that case made and provided.

So far as conforming to the standard required by the statute, the evidence fully justified the finding of the trial judge, and no reason is shown for interfering with the conclusion reached. But the further claim is made by the plaintiff that, inasmuch as water was used in the treatment of the acetic acid, a violation of the statute prohibiting the sale, as or for cider vinegar, any product or vinegar which is not cider vinegar, has been shown, and the allegations of the complaint are established thereby. We do not think this a sound conclusion. Having in view the evident intention of the statute to prevent adulteration and the introduction of deleterious matter into vinegar products, such construction should be given to the statute as would accomplish this purpose, while not trenching upon the rights of the manufacturer or dealer in vinegar products. We think the construction attempted to be given to the word "pure," as used in the statute, is not the construction intended by the legislators. The word "pure" means, not only free from all foreign substance, but in its original sense "pure" means "free from any defiling or objectionable mixture." We have in chemistry "pure" products, but in

the various uses the chemical standard is modified to a great extent. For instance, we speak of pure water; meaning by that water that is not contaminated, not defiled, not vitiated, although it may have mineral salts in solution. It may have in solution any product not deleterious; yet, strictly speaking, the only water that can be said to be chemically pure is distilled water. Still, in the various legislative acts providing for pure water for municipalities and communities, it has never been contemplated that absolutely, chemically pure, distilled water was to be procured.

Under the evidence in this case—and it is undisputed—the presence of water is necessary in order to make a vinegar. In the process of manufacture the high percentage of acetic acid renders the product unmarketable, unpalatable, and not properly a vinegar, but an acid, and wholly unfit for the purposes to which merchantable vinegar is usually put. There is no denial that the water was "pure water," in the common acceptation of these words, not distilled water, and there is no claim made nor evidence to show that its addition was deleterious, or in any way impaired the quality or deteriorated the product, but, upon the contrary, it rendered the product a palatable and marketable article.

The object of the statute, namely, to prevent adulteration and injury to health, is not defeated, or in any way hindered, by the treatment of the apple juice in the course of manufacture by the introduction of pure water for the purpose of reducing the acid to vinegar. And so long as the product complied with the standard of unadulterated products, all its ingredients being pure and in no way deleterious, it ought not to be declared impure or adulterated. The construction to be given to the word "pure," as used in this statute, should be "free from mixture or contact with that which is deleterious, impairs, vitiates, or pollutes." Within this definition no violation of the statute has been shown, and the findings of the trial judge were justified by the evidence.

No error appears, and the judgment should be affirmed, with costs. All concur.